NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231580-U

NO. 4-23-1580

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| RUHL COMMERCIAL COMPANY, LLC, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Jo Daviess County |
| RJR HOLDINGS, INC., and DR. KENNETH DAVIS, | ) | No. 16CH57 |
| Defendants-Appellees. | ) | |
| | ) | Honorable |
| | ) | Kevin J. Ward, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Grischow concurred in the judgment.

**ORDER**

¶ 1  *Held:*  The appellate court reversed the trial court's judgment in favor of defendants after a bench trial because the judgment was against the manifest weight of the evidence.

¶ 2  This appeal arises out of a three-count complaint filed by plaintiff, Ruhl Commercial Company, LLC (Ruhl), asserting claims for (1) foreclosure of a real estate broker's lien, (2) breach of contract, and (3) unjust enrichment against defendants, RJR Holdings, Inc. (RJR Holdings), and Dr. Kenneth Davis. Ruhl sought to recover its commission, as well as attorney fees and costs, pursuant to both (1) a written commercial listing agreement between Ruhl and RJR Holdings and (2) the Commercial Real Estate Broker Lien Act (Act) (770 ILCS 15/1 *et seq.* (West 2014)).

¶ 3  In November 2023, following a bench trial, the trial court entered a written

judgment in which it ruled that although Ruhl proved it was entitled to a commission in the amount of $46,051.83, Ruhl "otherwise failed to make any showing which would support any judgment in its favor as to Counts I, II, and III of its Amended Complaint." The court based this conclusion on its determination that the listing agreement's silence on when and how a commission was to be paid must be interpreted against Ruhl as the drafter to allow RJR Holdings to pay the commission in installments over time, which RJR Holdings had done pursuant to an earlier court order. The judgment also extinguished Ruhl's broker's lien and ordered that each party bear its own costs and fees.

¶ 4        Ruhl appeals, arguing the trial court's interpretation of the listing agreement was erroneous and that Ruhl is entitled to attorney fees as the prevailing party below. We agree, reverse the trial court's judgment, and remand for further proceedings.

¶ 5                                    I. BACKGROUND

¶ 6        The following information is taken from the record as a whole, including the admissions of the parties in their pleadings and motions for summary judgment, the testimony at the bench trial, and the exhibits admitted at trial. We note that the trial court explicitly found all witnesses credible and concluded that no factual dispute existed.

¶ 7                              A. The Listing Agreement

¶ 8        In April 2015, Ruhl and RJR Holdings entered into an "Exclusive Right to Lease Commercial Listing Agreement" (Listing Agreement), which gave Ruhl, a real estate brokerage company, the sole and exclusive right to procure a tenant for RJR Holdings' real property located at 939 Galena Square Drive in Galena, Illinois (Property), upon which it operated a car dealership on the front half and leased the back half to a motorcycle dealership. Most of the agreement contemplated the procurement of a tenancy. In the event of a lease, Ruhl's brokerage commission

was "six (6%) percent of the total Net lease of the initial term," to be paid "one-half at lease execution and one-half upon Tenant's occupancy."

¶ 9 Regarding the sale of the Property, the Listing Agreement contained only the following two provisions: (1) "The sales brokerage commission shall be 5% of the sales price," and (2) "List Price for Sale—$650,000." Both parties agreed to reimburse the other party for any costs and expenses, including reasonable attorney fees, incurred by that party "in enforcing any of the terms, conditions, or provisions" of the listing agreement.

¶ 10 B. The Agreement for Warranty Deed

¶ 11 On July 22, 2015, RJR Holdings and Davis entered into an "Agreement for Warranty Deed," in which RJR Holdings agreed to sell the Property to Davis in exchange for installment payments. The purchase price for the Property was $400,000, plus another $400,000 for improvements needed to transform a former Harley-Davidson dealership on the Property into a substance abuse clinic for Davis's practice. The Agreement for Warranty Deed explicitly stated that the purchase price included the cost of the improvements and that if the improvement costs exceeded $400,000, Davis was required to pay the excess costs before receiving a warranty deed.

¶ 12 Regarding payments, the Agreement for Warranty Deed required Davis to make a $10,000 down payment at the time of execution of the contract, which Davis, in fact, paid. Davis was required to make 60 consecutive monthly payments, beginning on the last day of the month in which the improvements were completed. The payment amount was subject to change upon the determination of the actual cost of improvements, and Davis was required to pay 5.5% interest per annum on the purchase price. A balloon payment consisting of the remaining principal and interest was due and payable to RJR Holdings following the 60 monthly payments. RJR Holdings was required to convey title to the Property to Davis via warranty deed only once Davis had paid the

full purchase price and completed all his obligations under the Agreement for Warranty Deed.

¶ 13    The default provisions specified that RJR Holdings could not declare or enforce a default until Davis was given written notice and time to cure. In the event of an uncured default, RJR was permitted, "at its sole option," to "accelerate the time of payment for the entire balance hereunder, together with accrued interest thereon, and any other charges, costs, expenses and attorney's fees due hereunder and require immediate payment thereof." Alternatively, RJR Holdings had the option to terminate the agreement and all of Davis's rights and interests and retain all payments made as liquidated damages. The Agreement for Warranty Deed expressly provided that the warranties and covenants contained therein survived performance and closing of the transaction and that the "covenant and agreements herein contained shall extend to and be obligatory upon the heirs, executors, administrators, successors and assigns of the respective parties."

¶ 14    Finally, the Agreement for Warranty Deed contained an escrow provision, which provided that RJR Holdings had executed a warranty deed for the Property and placed it in escrow with instructions that such deed be delivered upon Davis's complete payment and performance. The escrow provision further provided that Davis had executed and deposited a quit claim deed for the Property to be delivered to RJR Holdings "only in the event of Buyer's default hereunder."

¶ 15    C. Events Following Execution of the Sale Documents and Attempted Payment of Commission

¶ 16    The improvements began in August 2015 and were completed in April 2016.

¶ 17    Ruhl demanded RJR Holdings pay it a commission of $40,000, based on the purchase price of $800,000, immediately after the Agreement for Warranty Deed was executed. When RJR Holdings failed to pay, in November 2015, Ruhl recorded a broker's lien against the

Property.

¶ 18     At some point, RJR Holdings and Davis later agreed to amend the Agreement for Warranty Deed by changing the cost of improvements to the Property from $400,000 to $521,036. A copy of the undated amendment was admitted at trial, and RJR Holdings admitted that amendment accurately set forth the final terms of the Agreement for Warranty Deed. In addition to changing the cost of improvements portion of the purchase price, the amendment also replaced the payment provision of the Agreement for Warranty Deed with the following:

> "Payments for the original Property, in the amount of $2,456.35 shall commence in December of 2015, and shall continue on the last day of each and every month thereafter. Payments for the Improvements shall commence in May of 2016, and shall continue each and every month thereafter. Payments were calculated using an interest rate of five and one-half percent (5 1/2%) per annum. Buyer shall pay Seller in two separate monthly payments, the first in the amount of $2,456.35 toward the purchase of the Property, and the second in the amount of $3,200 toward the cost of the Improvements. Monthly payments shall continue through May of 2021, at which time all remaining principal and accrued interest shall be immediately due and payable by Buyer to Seller."

¶ 19     In February 2016, RJR Holdings sent Ruhl a letter and enclosed "a check for five percent (5%) of the amount collected by [RJR Holdings] pursuant to that certain land sale contract between [RJR Holdings] and Dr. Kenneth Davis of Galena Clinic, through 2015." The letter further stated that the listing agreement with Ruhl "provides for a five percent commission of the sale price of the property. The cost of building improvemnets [*sic*] is a separate contract negotiated between [RJR Holdings] and [Davis] and is not part of the listing agreement with [Ruhl]." The

letter then contained a breakdown of payments received from Davis and how RJR Holdings calculated the commission owed. The letter showed three payments from Davis—the $10,000 downpayment, a "November payment (half month)" for $1,226.68, and a December payment of $2,453.35—and asserted the total commission was $434.07. The letter then concluded as follows: "It is the intent of [RJR Holdings] to continue to pay you quarterly based upon amounts actually received. If you would prefer a different payment arrangement, please let us know."

¶ 20        Later in February 2016, Ruhl sent RJR Holdings a letter rejecting their attempted commission payment and returning the check, explaining, "We hereby refuse your offer and check to negotiate and reduce our brokerage fee, paying us quarterly for some 'unknown number' of quarters at 50% of the sales price." Ruhl maintained that the sales price was $800,000 based upon the terms of the Agreement for Warranty Deed and that RJR Holdings owed $40,000 in commission, "Due at Occupancy and Possession." Ruhl asserted that RJR Holdings was attempting to manipulate the sale price in an effort to reduce the commission.

¶ 21        The record contains three more letters and commission checks that RJR Holdings sent to Ruhl in 2016. The checks were written in October and November 2016, and the letters address the first three quarters of that year. Nearly identical to the February 2016 letter, these quarterly letters explained that (1) RJR Holdings intended to pay the commission as it received payments from Davis and (2) the purchase price was $400,000 and did not include the cost of improvements, which was a separate agreement between Davis and RJR Holdings. The amounts listed for each month were $2,456.35, the total commission was calculated at $368.45 for each quarter, and the check was for that same amount. The letters then concluded as follows: "It is the intent of RJR [Holdings] to continue to pay you quarterly based upon amounts actually received. If you prefer a different payment arrangement, please let us know."

¶ 22    In November 2016, Ruhl once again rejected the payments, explaining that the entire commission was due and payable in a lump sum and RJR Holdings was misrepresenting the terms of the sales contract, which explicitly included the costs of improvements in the purchase price.

¶ 23                    D. Procedural History

¶ 24                    1. *The Complaint and Answer*

¶ 25    In December 2016, Ruhl filed a three-count complaint against RJR Holdings and Davis, asserting claims (1) to foreclose its broker's lien in the amount of $40,000 plus interest, attorney fees, and costs pursuant to the Act (770 ILCS 15/1 *et seq.* (West 2014)), (2) for breach of contract for RJR Holdings' failure to pay the commission when due for the full purchase price, and, in the alternative, (3) for unjust enrichment. In December 2017, Ruhl filed an amended complaint, in which it asserted the same claims but sought a $46,051.83 commission in counts II and III based on a final purchase price for the Property in the amount of $921,036.68.

¶ 26    Defendants filed an answer, in which they admitted Ruhl procured Davis as a purchaser, who executed an agreement for warranty deed with RJR Holdings in July 2015, but they denied Ruhl was entitled to a commission or that its lien was valid. Defendants asserted they had not breached the listing agreement because RJR Holdings had attempted to pay Ruhl its commission in installments, as Davis made payments to RJR Holdings under the sales contract, but Ruhl rejected the payments.

¶ 27                    2. *The Motions for Summary Judgment*

¶ 28    In February 2019, defendants filed their first motion for summary judgment, in which they contended that no commission was due because no sale had occurred. Specifically, they asserted a sale under an agreement for warranty deed occurs only when all payments have

- 7 -

been made and title to the property had been transferred, which had not occurred in this case and would not occur for more than a year. Given that the listing agreement provided "[t]he sales brokerage commission shall be 5% of the sale price," defendants argued the commission would be due only if and when a sale occurred, at which point RJR Holdings stood "ready to pay a 5% commission on the sale price."

¶ 29 The trial court denied defendants' first motion for summary judgment in May 2019, explaining that the parties' actions and their positions in the pleadings suggested that a sale had in fact taken place and that Ruhl was entitled to a commission of 5% of the sales price.

¶ 30 Later in 2019, Ruhl and defendants filed cross-motions for summary judgment. In its motion, Ruhl argued that the Listing Agreement clearly incorporated the "default rule," well settled in Illinois based on long-standing practice and case law, that a broker's commission is earned when he procures a ready, willing, and able buyer to the seller on terms agreeable to the seller, regardless of whether the sale is completed thereafter. See *Fox v. Ryan*, 240 Ill. 391, 396-97 (1909). Ruhl asserted that it earned its full commission in July 2015, when Davis and RJR Holdings executed the real estate sale installment contract for the Property and RJR Holdings was required to pay the full amount of the commission in a lump sum.

¶ 31 In their second motion for summary judgment, defendants noted that the trial court denied the first motion "with the implication that a sale had occurred and a commission was due. The Court did not determine at what point a commission was due nor the amount of such commission." Regarding count I (claim for lien), defendants argued that Ruhl's lien was invalid because it was recorded in November 2015, before (1) the improvements were completed, (2) the final purchase price was determined to be $921,036.68, (3) Davis occupied the Property, and (4) Davis started making full monthly payments, all of which happened in May 2016.

¶ 32     Regarding count II, defendants conceded that "based upon the Court ruling on May 3, 2019, the Plaintiff's claim for breach of contract has merit." Defendants continued, "It is undisputed that that Plaintiff is owed a 5% commission on the 'sale price.' " Defendants argued that "sale price" was undefined and should be construed against Ruhl as the drafter of the Listing Agreement. Defendants calculated the "sale price" as $620,000 by subtracting the $301,036.68 "actual out-of-pocket cost of the buildout," which was "financed by RJR Holdings," from the "total price of the subject property," the aforementioned $921,036.68. Accordingly, defendants claimed the commission due under the breach of contract claim was $31,000. Defendants asked the trial court to "[g]rant judgment in favor of Plaintiff and against Defendant [RJR Holdings] [i]n the amount of $31,000."

¶ 33     In November 2019, the trial court entered an order requiring RJR Holdings to pay Ruhl a commission of $46,051.83 in 60 equal installments, retroactive to May 2016, when the final purchase price of the Property was agreed upon and Davis began making (full) payments to RJR Holdings to purchase the Property. The order gave RJR Holdings 30 days to bring the payments current and provided that RJR Holdings "shall only be deemed in breach of contract, and Plaintiff's broker lien shall only be deemed subject to foreclosure if Defendant RJR Holdings fails to make the payments ordered hereby." The order did not state whether the court had granted either party's motion or which claims, if any, were resolved; instead, it expressly reserved the issue of the validity of Ruhl's lien and its claim for attorney fees thereunder.

¶ 34     In January 2020, the trial court clarified its November 2019 order by expressly denying the parties' cross-motions for summary judgment.

¶ 35     In January 2023, after RJR Holdings made all payments as required by the November 2019 order, Ruhl filed a motion for summary judgment in which it sought attorney fees

and costs, asserting that (1) defendants had made all payments required by the trial court's November 2019 order and (2) as a result, Ruhl was a prevailing party entitled to fees and costs under the Act and the terms of the Listing Agreement. That same month, defendants filed a cross-motion for summary judgment, arguing that because they paid the commission in full in accordance with the November 2019 order, (1) Ruhl's claims were moot, (2) the lien should be extinguished, and (3) defendants were a prevailing party entitled to fees and costs.

¶ 36          In March 2023, the trial court entered a written order denying both motions. The court found that although the commission had been paid in full, the court's November 2019 order was interlocutory and did not resolve any of the parties' claims on the merits, which meant that neither party had "prevailed." The court found that the only dispute between the parties was when and how the commission was to be paid. On the merits of Ruhl's claims, the court found that the Listing Agreement was silent as to (1) what constituted a sale and (2) the timing and manner of payment of the commission. The court concluded that it could not interpret the terms of the Listing Agreement without parol evidence regarding the intention of the parties on these issues and set the case for trial.

¶ 37                      3. *The Bench Trial and Final Judgment*

¶ 38          In October 2023, the trial court conducted a bench trial at which Ray Oczak, the designated real estate broker under the Listing Agreement, and the co-owners of RJR Holdings testified. The testimony at trial was consistent with our earlier recitation of the factual background and the admissions in the parties' pleadings. Relevant to this appeal, Oczak testified that he was the sole drafter of the Listing Agreement and that he added the listing price and sales commission provisions. He explained that Ruhl and RJR Holdings had a prior listing agreement solely to lease the property that was about to expire and he drafted the new agreement to extend the listing period

and to include a possible sale of the property.

¶ 39 RJR Holdings' vice-president and 50% shareholder, John Wilson, testified and described the origins of the transaction as follows: "Basically, when [Davis] first came in he kinda laid his cards on the table and says I've got ten thousand dollars, I'll pay you five and a half interest, and I can't borrow any money but I probably can in five years. So we kinda took it from there." Wilson explained that RJR Holdings borrowed money from its lender to finance the improvements "[b]ecause of our credit ratings with Dupaco [(RJR Holdings' lender)] and the fact that Dupaco wouldn't loan [Davis] anything, he made us an offer at five and a half percent which we accepted." Wilson further testified as follows:

> "I'm distinctly remember[ing] talking to my banker and he told me, he says, no way in hell I would sell [Davis] anything. He said if you guys are going to take the risk[,] bear in mind it's all yours. So, yeah, we took a hell of a risk by doing this."

¶ 40 Rosean Schromen testified she was Wilson's wife, co-owner, and RJR Holdings' president. Schromen and Wilson both testified that they believed the sale price of the Property was $400,000 and that a commission should not be owed to Ruhl on the cost of the improvements.

¶ 41 In their closing arguments, defendants asked the trial court to find (1) that no sale of the Property had occurred because the full amount had not been paid and the title was never transferred or (2) that if any commission was due, the amount should be calculated as 5% of the amount RJR Holdings actually received from Davis, which totaled $351,663, for a commission of $17,583.15.

¶ 42 In November 2023, the trial court entered a written order resolving all claims and issues in the case. In that order, the court found that (1) all witnesses were credible, (2) no disputed material facts existed, and (3) the parties failed to present any parol evidence of the parties' intent

about the provision for payment of a sales commission in the Listing Agreement.

¶ 43    Ultimately, the trial court concluded that Ruhl had shown that it was entitled to a commission in the amount of $46,051.83 but failed to prove it was entitled to payment in a lump sum at the time the Agreement for Warranty Deed was executed by Davis and RJR Holdings in July 2015. The court reasoned that although old common law authority existed to support Ruhl's position, that authority was unpersuasive because the Act, which was passed in 1991, "brought the concept of payment of commissions in installments within contemplation of Illinois law," citing section 10(c) of the Act (770 ILCS 15/10(c) (West 2014)). Based on this statutory language and the undisputed fact that Ruhl drafted the Listing Agreement, the court construed the Listing Agreement in favor of RJR Holdings to mean that the parties intended Ruhl's commission to be paid in installments as Davis made payments to RJR Holdings under the Agreement for Warranty Deed. The court, without elaboration, also concluded that the "evidence further demonstrates this is, in fact, what happened."

¶ 44    The trial court also found Ruhl failed to prove it was entitled to a commission under the Act because the parties intended for the commission to be paid in installments and RJR Holdings made those payments in full during the course of the litigation. As such, the court ordered Ruhl's brokerage lien was thereby extinguished. Regarding the breach of contract claim, the court found that Ruhl failed to prove RJR Holdings breached the agreement because "the evidence demonstrates that RJR [Holdings] complied with the Agreement as construed." (The unjust enrichment claim failed as a matter of law because the parties had a written contract for the brokerage services Ruhl provided and RJR Holdings paid for.)

¶ 45    The trial court also concluded that neither party was entitled to attorney fees or prevailing party status because each party won and lost on different claims. Specifically, the court

reasoned that Ruhl

> "successfully demonstrated it was entitled to a commission, in a specific amount. Defendants failed to show Plaintiff was not so entitled. The evidence otherwise demonstrated that the commission was payable in installments, for a period of years following closing. Plaintiff failed to show its commission was immediately payable in lump sum at closing."

¶ 46    This appeal followed.

¶ 47                                  II. ANALYSIS

¶ 48    Ruhl appeals, arguing the trial court's interpretation of the Listing Agreement was erroneous and that Ruhl is entitled to attorney fees as the prevailing party below. We agree, reverse the trial court's judgment, and remand for further proceedings.

¶ 49                        A. The Proper Standard of Review

¶ 50    As an initial matter, we must determine the appropriate standard of review. On appeal, the parties agree, as they did before the trial court, that resolution of this case rests on an interpretation of the terms of the commercial listing agreement regarding payment of a commission upon the sale of the Property. The interpretation of contracts presents an issue of law that appellate courts review *de novo*. *In re Marriage of Dynako*, 2021 IL 126835, ¶ 15. However, if the trial court determines that a contract is ambiguous and considers parol evidence, the meaning of the terms of the contract is a question of fact to be decided at trial. *Farm Credit Bank of St. Louis v. Whitlock*, 144 Ill. 2d 440, 447 (1991). Generally, the standard of review following a bench trial is whether the trial court's order or judgment is against the manifest weight of the evidence. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12.

¶ 51    Here, the trial court found the Listing Agreement ambiguous because "[t]he ***

- 13 -

agreement is silent as to what constitutes a sale and, upon sale, the time and manner in which any commission is to be paid." Accordingly, the court conducted a bench trial to hear parol evidence regarding the intentions of the parties. Thus, the parties seem to agree that the standard of review on appeal is manifest weight.

¶ 52 However, in its written order, the trial court explicitly found that (1) the witnesses were credible and (2) there was no dispute of material fact. The court then noted it had previously held (in its March 2023 order denying summary judgment) that "without parol evidence it is not possible to ascertain the intent of the parties." Additionally, the court wrote in its November 2023 final order, "Notwithstanding the foregoing [—namely, the necessity of parol evidence], at trial, the parties presented no parol evidence as to what the intentions of the parties may have been at the time of the execution of the [Listing Agreement] as to payment of commission."

¶ 53 Given this context, we conclude that deferential review is inappropriate. The trial court's explicit findings demonstrate that no dispute of material fact existed and the court's ruling was not based on the evidence presented at trial because no relevant parol evidence was presented. Under these circumstances, deferential review is improper because the trial court did not make any credibility determinations to which we can defer. *Cf. People v. Carter*, 2021 IL App (4th) 180581, ¶ 68 ("Any time a trial court serves as a fact finder, perhaps the single most important thing the court can do is say whom it believes and whom it does not. When the trial court favors us with such a finding, we are at the height of our deference to that court.").

¶ 54 Instead, the trial court relied on (1) the plain language of the Listing Agreement, (2) the rules of contract interpretation, and (3) the provisions of the Act, specifically, section 10(c) (770 ILCS 15/10(c) (West 2014)). We do the same, and because we are likewise relying on the plain text of the Listing Agreement and well settled rules, *de novo* review is proper. See *Dynako*,

2021 IL 126835, ¶ 15.

¶ 55                    B. The Proper Construction of the Listing Agreement

¶ 56        To begin, we agree with the trial court's determination, in its November 2023 judgment, that the "only disputed question[s]" it needed to decide to resolve Ruhl's claims were the following. First, Ruhl's claim under the Act depended on "whether it has shown that it was entitled to a commission under a written instrument." And second, Ruhl's breach of contract claim depended on "whether it has shown definite and certain terms and a breach by RJR [Holdings]." The court concluded that "[t]he analysis as to both claims is essentially identical." We likewise agree.

¶ 57                    1. *When a Broker's Lien Is Valid Under the Act*

¶ 58                         a. The Applicable Law

¶ 59        The Act provides that a broker shall have a lien upon commercial real estate in the amount the broker is due under a written instrument signed by the owner of an interest in the commercial real estate. 770 ILCS 15/10(a)(1) (West 2014). The broker's lien is valid and attaches

"upon: (1) the broker being otherwise entitled to a fee or commission under a written instrument ***; and (2) *** the broker recording a notice of lien in *** the county in which the commercial real estate is located prior to the actual conveyance or transfer of the commercial real estate." *Id.* § 10(b).

¶ 60                         b. This Case

¶ 61        Here, no dispute existed that the parties had a valid written instrument—the Listing Agreement—and Ruhl recorded its notice of lien prior to the actual conveyance of the Property. Accordingly, the only question the trial court needed to answer was whether Ruhl was "entitled to a fee or commission under" the Listing Agreement.

¶ 62    In its November 2023 judgment, the trial court repeatedly found that Ruhl "proved it that it was entitled to a commission in the amount of $46,051.83." This finding was not only amply supported by the evidence, but RJR Holdings also repeatedly admitted as much throughout the proceedings. Moreover, the court found in November 2019 that (1) a sale had occurred with a purchase price of $921,036.68 and (2) Ruhl was entitled to a commission in the amount of $46,051.83.

¶ 63    Given that the trial court again found in its final judgment that Ruhl was entitled to a commission—the sole issue the court stated would determine the merits of Ruhl's claims—it is perplexing why the court nonetheless reached the exact opposite result in its conclusion in the judgment. In support of judgment against Ruhl, the court reasoned, "The evidence *** showed that the commission due Plaintiff was intended to be paid in installments as payments were made under the Agreement for Warranty Deed between RJR [Holdings] and its buyer." The court's reasoning is based on a fundamental misunderstanding of the provisions of the Act and a construction of the Listing Agreement that is (1) contrary to established law and (2) unsupported by the evidence.

¶ 64    2. *Interpreting and Construing the Language of the Listing Agreement*

¶ 65    a. The Applicable Law

¶ 66    When interpreting the terms of a contract, the court's focus is to discover the intention of the parties, the best indicator of which is the plain and ordinary meaning of the language contained within the "four corners" of the written contract itself. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011); *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). "[A] contract must be construed, relying on objective criteria, in accordance with the ordinary expectations of reasonable people." *Carey v. Richard's Building Supply Co.*, 367 Ill. App. 3d 724,

728 (2006).

¶ 67    In the absence of an ambiguity, a court will apply the plain language as written. *Clanton v. Oakbrook Healthcare Centre, Ltd.*, 2023 IL 129067, ¶ 30. A contract is ambiguous when it is subject to more than one reasonable interpretation or is obscure in meaning. *Id.* ¶ 33; *Gordon*, 241 Ill. 2d at 441. An ambiguity does not exist merely because the parties disagree as to the meaning of a provision of a contract. *Clanton*, 2023 IL 129067, ¶ 33. If an ambiguity exists, a court will consider parol evidence to ascertain the intention of the parties regarding the meaning of the disputed provision or term. *Gordon*, 241 Ill. 2d at 441. "[T]he doctrine that an ambiguous term is to be interpreted against the drafter is a last resort to be employed only after a court has exhausted other interpretive guides." *Eckhardt v. The Idea Factory, LLC*, 2021 IL App (1st) 210813, ¶ 31.

¶ 68    "[A] basic rule of the construction of contracts and a material part of every contract is that all laws in existence when the contract is made necessarily enter into and form a part of it as fully as if they were expressly referred to or incorporated into its terms." (Internal quotation marks omitted.) *Village of Kirkland v. Kirkland Properties Holdings Co.*, 2023 IL 128612, ¶ 60. "[I]t is presumed that parties contract with knowledge of the existing law, and the statutes and laws in existence at the time a contract is executed are considered part of the contract." *Fox v. Heimann*, 375 Ill. App. 3d 35, 44 (2007). "The rationale for this rule is that the parties to the contract would have expressed that which the law implies had they not supposed that it was unnecessary to speak of it because the law provided for it." (Internal quotation marks omitted.) *Id.*

¶ 69                      b. This Case

¶ 70    Here, the trial court relied almost exclusively upon the canon of construction that contracts are to be construed against the drafter in arriving at its conclusion that the parties intended

- 17 -

that any commission would be paid in installments as payments were made under the Agreement for Warranty Deed. The court also found that the evidence presented at trial demonstrated that Ruhl's commission was due and paid in installments as intended by the parties. However, the court's findings were against the manifest weight of the evidence. We conclude that the trial court erred by relying exclusively on the canon of *contra proferentem* (that is, contracts are to be construed against the drafter) to find that the parties intended, and the Listing Agreement would be construed to require, that any commission due Ruhl would be paid in installments as payments were made to RJR Holdings by Davis.

¶ 71     First, the Listing Agreement was signed months before the sales contract was executed, and nothing in the Listing Agreement suggests that the payment of the purchase price in installments was a necessary term of the sale—either to entitle the broker to a commission or for the seller to agree to sell the Property. Accordingly, the terms of the sales contract executed in July 2015 cannot have been in the contemplation of the parties when they entered into the Listing Agreement in April 2015.

¶ 72     Second, the trial court's November 2023 judgment completely ignores the fact that the defendants never attempted to make commission payments in installments as payments were made to RJR Holdings by Davis. Indeed, RJR Holdings' initial position was that no sale occurred (and Ruhl was entitled to no commission) until after all 60 installment payments by Davis to RJR Holdings were made and the deed was conveyed; RJR Holdings only began to make monthly payments to Ruhl after the trial court entered its November 2019 order requiring such commission payments to be made.

¶ 73     Third, and most importantly, that canon of construction is inapposite to this case because the law clearly sets forth the default rule, and we presume that parties (1) incorporate the

existing law into the terms of the contract (*Braye v. Archer-Daniels-Midland Co.*, 175 Ill. 2d 201, 217 (1997); *Schiro v. W.E. Gould & Co.*, 18 Ill. 2d 538, 544 (1960)) and (2) expect background customs and principles pertaining to similar transactions in the ordinary course to apply and fill any gaps in the absence of language to the contrary. See *Schiro*, 18 Ill. 2d at 544 ("[T]he parties to the contract would have expressed that which the law implies had they not supposed that it was unnecessary to speak of it because the law provided for it." (Internal quotation marks omitted.)).

¶ 74        The Listing Agreement was very specific about when a commission was to be paid in the event that the resulting transaction was a lease, but it was completely silent regarding the same for a sale. There is a strong presumption against conditions that could have been easily included by the parties as terms of the contract but were not. *Iser Electric Co. v. Ingran Construction Co.*, 44 Ill. App. 3d 640, 644 (1976). Therefore, we take this situation to mean that the parties could have been similarly specific about a sale but did not believe it was necessary because the ordinary rules applying to brokerage commissions are so well established.

¶ 75        Here, the normal default rule is well established and is consistent with common experience. Nearly anyone who has bought or sold real estate (certainly the vast majority of us) is well aware of real estate commissions and when those commissions are earned and paid—namely, they are earned when the contract is executed and payable at closing. The law regarding brokerage commissions confirms this common understanding.

 ¶ 76            3. *Well-Settled Illinois Law Establishes When a Broker's Commission Is Earned and Payable*

¶ 77        Over 100 years ago, in *Fox v. Ryan*, 240 Ill. 391, 396-97 (1909), the Illinois Supreme Court set forth the general rule for determining when a broker is entitled to receive a commission, writing as follows:

"Where a broker is employed to sell property by the owner, if he produces a purchaser within the time limited by his authority who is ready, willing, and able to purchase the property upon the terms proposed by the seller, he is entitled to his commissions, even though the seller refuses to perform the contract on his part. *** [W]here the seller accepts the purchaser and enters into a valid contract of sale with him, the broker's commission is earned whether the purchaser subsequently fails to perform his contract and make the payments agreed upon or not. There are cases in other states holding otherwise, but in *Wilson v. Mason*, 158 Ill. 304, 311 *** [(1895)], this court refused to follow those cases, denominating them as extreme and exceptional, and said: 'The true rule is that the broker is entitled to his commissions if the purchaser presented by him and the vendor, his employer, enter into a valid, binding and enforceable contract. If, after the making of such a contract, even though executory in form, the purchaser declines to complete the sale and the seller refuses to compel performance, the broker ought not to be deprived of his commissions. He has done all that he can do when he produces a party who is able, and in binding form offers, to purchase upon the proposed terms. An agreement by a real estate broker to procure a purchaser not only implies that the purchaser shall be one able to comply, but that the seller and the purchaser must be bound to each other in a valid contract. So, where the agreement of the real estate broker is to make a sale, his commission is earned when a contract is entered into which is mutually obligatory upon the vendor and vendee, even though the vendee afterwards refuses to execute his part of the contract of sale or purchase.' "

¶ 78    The general rule set forth in *Fox* has been reaffirmed and applied by lower courts

ever since. See, *e.g.*, *Hallmark & Johnson Properties, Ltd. v. Gadea*, 218 Ill. App. 3d 921, 926 (1991) ("The general rule governing a broker's right to receive a commission is well settled. If a broker who is employed to sell property by the owner produces a purchaser *** who is ready, willing and able to purchase the property on the terms prescribed by the seller, he is entitled to a commission."). "If a valid, enforceable contract was made, this constituted a sale, and was a compliance with the agreement between appellant and appellee." *Fox*, 240 Ill. at 395; see *Stephen L. Winternitz, Inc. v. National Bank of Monmouth*, 289 Ill. App. 3d 753, 757-58 (1997) (applying and relying on this rule from *Fox*).

¶ 79          Other cases have applied this general rule to determine when a broker earns a commission in cases where the agreement with the broker is missing a clear term controlling when the commission is earned or to be paid. See *Zink v. Maple Investment & Development Corp.*, 247 Ill. App. 3d 1032, 1037 (1993) ("[The agreement] does not specifically state when the commission is earned. Therefore, the settled rule governing a broker's right to receive a commission applies."). Recently, the Third District addressed this problem in *Schiller v. HomeServices of Illinois, LLC*, 2024 IL App (3d) 220405, ¶ 39, in which it wrote the following:

> "The agreement here does not specifically state when the commission is earned. Thus, the contract is ambiguous as to this issue, and the settled rule regarding when a broker is entitled to receive a commission applies. [*Zink*, 247 Ill. App. 3d at 1037]. A plaintiff's right to recover his commission is governed by his employment agreement with the defendant. *Id.* Accordingly, the case law indicates that the Schillers earned their commission when a viable real estate contract was executed."

¶ 80          We also note that neither defendants nor the trial court provided any explanation for how one could be entitled to receive a commission but yet not be entitled to payment of that

- 21 -

commission in the absence of contract language to the contrary. In the absence of any evidence suggesting the parties wanted to change the default rule, we apply it.

¶ 81        Applying the foregoing to the present case, no dispute exists that Ruhl is entitled to a commission. The parties entered into a Listing Agreement that provided, "The sales brokerage commission shall be 5% of the sales price." Just as in *Fox*, the Listing Agreement contemplated that the broker was to procure a sale of the property, at which time its commission would be earned. The parties agreed, and the trial court found both in its November 2019 order and its November 2023 judgment, that (1) RJR Holdings and Davis executed an Agreement for Warranty Deed in July 2015, (2) such agreement constituted a sale of the Property, and (3) RJR Holdings and Davis subsequently performed on that contract for five years. Further, the witnesses testified at trial that the property was sold under the Agreement for Warranty Deed and RJR Holdings attempted to make commission payments as early as February 2016, which was already three months after Davis began making payments. Accordingly, we conclude that (1) Ruhl became entitled to its commission in July 2015 and (2) the trial court erred by not so holding.

¶ 82        4. *The Trial Court's Reliance on the Act Was Erroneous*

¶ 83        In its November 2023 judgment, the trial court found that the "Listing Agreement is ambiguous, with respect to what constituted a sale and, upon sale, the time and manner in which any commission was to be paid, as the agreement was 'obscure in meaning through indefiniteness of expression.' " The court then engaged in the following analysis to resolve the perceived ambiguity:

> "The Commercial Real Estate Broker Lien Act first became effective in November, 1991. Prior thereto authority existed supporting the proposition that a broker was entitled to his commission upon procuring a buyer ready, willing and

able to purchase the property on terms acceptable to a seller, [*e.g.*,] *Farber v. Fleck*, 51 Ill. App. 2d 145, 145 \*\*\* (1964). *Farber* precedes the enactment of the Act.

[The trial court engaged in a brief discussion of *Farber*.]

Subsequently, the Act brought the concept of payment of commission in installments within contemplation of Illinois law. See 770 ILCS 15/10(c) [(West 2014)], *supra*. [Section 10(c) provides, "when payment to a broker is due in installments, a portion of which is due only after the conveyance or transfer of the commercial real estate, any claim for lien for those payments due after the transfer or conveyance may be recorded at any time subsequent to the transfer or conveyance of the commercial real estate and prior to the date on which the payment is due but shall only be effective as a lien against the commercial real estate to the extent monies are still owed to the transferor by the transferee. A single claim for lien recorded prior to transfer or conveyance of the commercial real estate claiming all monies due under an installment payment agreement shall not be valid or enforceable as it pertains to payments due after the transfer or conveyance." 770 ILCS 15/10(c) (West 2014)).]

Under Illinois law in effect at the time this listing agreement was executed, sales commissions could clearly be paid in installments. Broker commission contracts could specify any number of terms and conditions relating to payment of commissions ([*e.g.*,] commission could become due/payable upon mere procurement of a buyer, the consummation of a sale, or, where an installment purchase agreement is involved, as installment purchase payments are made).

Plaintiff cites *Fox v. Ryan*, 240 Ill 391 \*\*\* [(1909),] and *Webster v. Hochberg*, 105 Ill. App. 2d 466 \*\*\* (1969) for the proposition that a broker will be deemed entitled to his compensation if he secures a purchaser ready, willing and able to purchase a property on terms acceptable to the seller. Neither case is any more illuminating than *Farber* in that they state the law as it existed prior to the adoption of the Act."

¶ 84    The trial court clearly believed that the Act fundamentally changed the substantive law in Illinois regarding when and how a broker became entitled to receive a commission. Indeed, the court went so far as to reject out of hand any case addressing broker commissions that was published prior to the effective date of the Act. The court appears to have based this conclusion purely on the wording of section 10(c) of the Act because it failed to cite or identify any other source of authority in support thereof, and we are unable to locate any. Tellingly, defendants do not attempt to justify or defend the court's reasoning on this point.

¶ 85    The reasoning the trial court employed to reach its result is a classic example of the logical fallacy of "begging the question." That is, the court's rationale assumes the truth of its conclusion without any evidence to support the premise. The court essentially concludes that (1) because section 10(c) of the Act establishes specific limitations on liens when payment to a broker is due in installments, (2) the Listing Agreement in this case must have intended the commission to be paid in installments in the absence of language to the contrary.

¶ 86    We conclude that the trial court's reasoning was erroneous. To begin, nothing in the Act even remotely suggests, much less *requires*, that the Act alters, governs, or otherwise affects the terms of an agreement between a client and its broker or how that agreement should be interpreted. In fact, the Act expressly provides the opposite. That is, the Act grants a broker a lien

only when the broker is entitled to a commission under the terms of a written instrument; the terms of the written instrument are interpreted first and without reference to the Act (to determine if a commission is due) before the Act's requirements come into play.

¶ 87        Moreover, nothing in the Act purports to change the existing law governing brokers' agreements. Once again, if anything, the plain language of the Act strongly suggests that it was intended to be in conformity with existing law and standard practices in the industry. Contrary to the trial court's proclamation, the fact that the Act sets forth different requirements for liens depending on the type of brokerage services rendered and the terms of agreements for the same demonstrates that the Act was drafted to operate consistently with the current conditions on the ground and intended to neatly fit within those conditions, not radically alter them.

¶ 88        The trial court's interpretation of section 10(c) is particularly aberrant considering that that section is applicable to a very specific and limited situation. The plain and unambiguous language of section 10(c) of the Act expressly provides that the requirements of that section apply "*when payment to a broker is due in installments*." (Emphasis added.) 770 ILCS 15/10(c) (West 2014). In this case, the court explicitly found in both its March 2023 order denying summary judgment and its November 2023 final order that the listing agreement was completely silent as to the time and manner of payment, and we agree. Because the listing agreement does *not* provide for payment to the broker in installments, section 10(c) is entirely irrelevant to this case, and the court erred by concluding subsection (c) controlled the interpretation of the agreement.

¶ 89                    C. Ruhl Was a Prevailing Party

¶ 90        In its March 2023 order, the trial court found that "the gist of [the parties'] dispute is how and when any commission earned under the listing agreement, or the Act, would be paid." In its November 2023 order, the court wrote that, (1) for Ruhl's claim under the Act, "the only

disputed question is whether [Ruhl] has shown that it was entitled to a commission under a written instrument" and (2) for Ruhl's claim for breach of contract, "the only disputed question is whether [Ruhl] has shown definite and certain terms and a breach by RJR [Holdings]."

¶ 91 The record demonstrates that defendants contested (1) whether a commission was due, (2) the amount due, and (3) how and when any commission was to be paid. Further, the trial court's order from November 2019 did grant a judgment, in part, in Ruhl's favor.

¶ 92 1. *The Disputes About the Commission*

¶ 93 Defendants challenged the amount and timing of any commission due, as well as whether any commission was due at all. The letters show defendants were paying quarterly based on a purchase price of $400,000. Defendants argued to the trial court in November 2019 and November 2023 for a commission based on a purchase price of less than $921,036.68. Defendants also argued that no sale had occurred in their original motion for summary judgment. In fact, RJR Holdings even argues in its brief to this court that Ruhl did not earn a commission because, among other things, (1) Davis was never a ready, willing, and able purchaser because he never had sufficient funds to pay the purchase price, (2) RJR Holdings and Davis "never executed an enforceable contract for the sale of the property," and (3) RJR Holdings never conveyed the property to Davis because, after making 60 months of installment payments, he failed to make the final balloon payment per the terms of the installment contract.

¶ 94 But the trial court repeatedly found no dispute as to the fact of the sale, the purchase price, or the amount of the commission. Based on these undisputed facts, the court's November 2019 order found that no dispute existed that Ruhl had, in fact, earned a commission in the amount of $46,051.83. The court made the exact same findings in its November 2023 final order. The court's November 2019 order established a higher amount of commission and monthly payments

than RJR Holdings had ever attempted or even been willing to pay.

¶ 95    The trial court improperly characterized the nature of the parties' dispute as solely concerning how and when a commission was due and payable. The record unequivocally demonstrates that defendants consistently contested (and continue to contest) that (1) Ruhl was entitled to any commission, either because Davis was never a ready, willing, and able purchaser or because an actual sale never occurred because Davis failed to make all payments and title did not transfer; (2) the purchase price of the sale was $400,000, or, to the extent improvements would be included, those improvements were only $301,000, resulting in a commission of roughly $31,000; and (3) RJR Holdings' responsibility to pay Ruhl was contingent upon its receiving payments from Davis—that is, RJR Holdings claimed it only ever owed Ruhl 5% of the payments it collected from Davis.

¶ 96    The evidence clearly demonstrates that RJR Holdings sent quarterly, not monthly, payments to Ruhl. The letters with those payments expressly stated that the purchase price was $400,000 and the cost of the improvements was a separate contract between RJR Holdings and Davis to which Ruhl was not a party. In its brief, RJR Holdings makes the following representations to this court:

> "RJR [Holdings'] initial commission payments to Ruhl were based on 5%
> of the payments it was receiving from [Davis]. Under the Agreement for Warranty
> Deed, the initial payments made by [Davis] to Ruhl [*sic*] did not include the cost of
> the buildout. In May of 2016, [Davis] began making the full monthly payments to
> RJR [Holdings] once the buildout was done and the total price of the property could
> be determined. [Citation.] Likewise, RJR [Holdings'] commission payments to
> Ruhl *increased once the cost of improvements was determined.*

In November of 2019, the circuit court ruled that the Commercial Listing Agreement would be read to require any commission due Ruhl, 'would be paid in installments as payments were made to RJR [Holdings] by Davis.' [Citation.] [(Here, we note that RJR Holdings quotes from and cites the trial court's November 2023 order, not its November 2019 order.)] This is precisely what RJR [Holdings] attempted to do in 2016 by making payments to Ruhl for 5% of what it received from [Davis]. *Had Ruhl accepted the checks from RJR [Holdings] in 2016, 2017, 2018 and through November of 2019, RJR [Holdings] would have been right on schedule with its payments under the circuit court's November 2019 order.* [(Here, again, RJR Holdings cites the court's November 2023 order, as well as the letters and checks it sent to Ruhl in 2016.)]" (Emphases added.)

¶ 97    RJR Holdings' assertions, particularly the ones we emphasized, are patently contrary to the evidence in the record that it cites in support of those assertions. The letters explicitly state that the checks are for "5% of the amount collected by RJR [Holdings] pursuant to that certain land sale contract." The letters further state that the Listing Agreement with Ruhl "provides for a five percent commission on the sale price of the property. The cost of the building [improvements] is a separate contract negotiated between RJR [Holdings] and [Davis] and is not part of the listing agreement with [Ruhl]." The letters then state that the accompanying checks "represent[ ] the amount[s] collected for July, August and September of 2016." The amounts listed for each month are $2,456.35, the total commission is calculated at $368.45 for each quarter, and the check is for that same amount. The letters then conclude as follows: "It is the intent of RJR [Holdings] to continue to pay you quarterly based upon amounts actually received. If you prefer a different payment arrangement, please let us know."

¶ 98         The November 2019 order required RJR Holdings to pay Ruhl $46,051.83 over 60 months beginning (retroactively) in May 2016. That amounts to $767.53 *per month*, almost exactly $400 more than RJR Holdings was paying Ruhl in 2016 *every three months*. Further, nothing in the November 2019 order conditioned RJR Holdings' commission payments on receipt of funds from Davis. As RJR Holdings highlighted in its brief to this court, Davis only made $351,665 in payments to RJR Holdings over the life of the Agreement for Warranty Deed.

¶ 99         The trial court erred by concluding in its November 2023 final order that the evidence showed that the parties intended to and RJR Holdings did pay the commission in installments as payments were made to RJR Holdings by Davis under the Agreement for Warranty Deed.

¶ 100         2. *The Trial Court's November 2019 Order Was a Favorable Judgment for Ruhl*

¶ 101         The trial court's November 2019 order was an enforceable judgment. RJR Holdings was required to pay the full amount regardless of Davis's performance. The order constituted a payment schedule, mandating that RJR Holdings pay Ruhl a commission of $46,051.83 over 60 months, retroactive to May 2016, and gave RJR Holdings 30 days to pay arrears. The order provided that RJR Holdings "shall only be deemed in breach of contract, and Plaintiff's broker lien shall only be deemed subject to foreclosure if Defendant RJR Holdings fails to make the payments ordered hereby." Accordingly, Ruhl was entitled to enforce the judgment against RJR Holdings if RJR Holdings ever failed to comply.

¶ 102         The trial court's November 2019 order was not a final and appealable judgment because it (1) did not resolve all pending claims and (2) expressly reserved the issue of the validity of Ruhl's lien and its claim for attorney fees thereunder. But this fact does not mean the November 2019 order was any less of a judgment in Ruhl's favor. The order did resolve the most significant

issues in the breach of contract claim, if not the entire case—namely, (1) whether Ruhl was entitled to a commission at all, (2) the amount of that commission, (3) when the commission was to be paid, and (4) whether payment was contingent on Davis's making payments to RJR Holdings under the Agreement for Warranty Deed. (We note that the trial court concluded in its November 2023 final order that the only disputed issues in counts I and II were substantively identical for both claims: whether Ruhl was entitled to a commission under a written agreement and RJR Holdings had breached that agreement.)

¶ 103 As we earlier held, the trial court should have found that the default rule applied and Ruhl's commission was fully earned when RJR Holdings and Davis entered into a binding installment contract for the sale of the Property. Indeed, the court's rulings suggest that it did, in fact, so conclude, certainly as a matter of logic (and undisputed fact) if not as a matter of law. Ruhl could not have been entitled to a commission of $46,051.83 unless the commission was earned at the time of performance.

¶ 104 The trial court held that it was undisputed that RJR Holdings and Davis subsequently amended the Agreement for Warranty Deed to determine the final sale price after the improvements were completed on or about May 2016, when Davis's monthly payments increased. Davis made a $10,000 down payment in July 2015, when the installment contract was executed. Davis then made a partial monthly payment on a purchase price of $400,000 in November 2015 and full monthly payments on that same $400,000 purchase price in December 2015 and January, February, March, and April 2016. Davis made his "first full payment in the amount of $5,656.35 *** under the final Agreement for Warranty Deed in May of 2016 when the buildout of the facility was completed and the total cost of the improvements were finally determined." RJR Holdings judicially admitted these facts. Accepting these admissions, the court, in its November 2019 order,

determined that the Agreement for Warranty Deed became a complete and binding executory contract upon RJR Holdings and Davis for the sale of the property in the amount of $921,036.68 in May 2016.

¶ 105                                  D. Remand

¶ 106          For the reasons stated, the trial court should have entered judgment in Ruhl's favor completely in November 2019. Nonetheless, the November 2019 order was still a favorable judgment for Ruhl for the purpose of determining prevailing party status under the terms of the Listing Agreement. The Listing Agreement provides, "Lessor [RJR Holdings] shall pay Broker for all costs and expenses, including reasonable attorney's fees, incurred by Broker in enforcing any of the terms, conditions, or provisions hereof." As discussed, the November 2019 order determined (1) the "sales brokerage commission," which was to be calculated at "5% of the sales price," earned by Ruhl under the Listing Agreement was $46,051.83 and (2) RJR Holdings was unconditionally required to pay that commission beginning in May 2016. Regardless of whether the commission was payable as a lump sum or in 60 monthly installments, Ruhl would never have received that commission from RJR Holdings had it not successfully enforced the terms of the Listing Agreement against RJR Holdings through litigation and obtained the November 2019 judgment in its favor. Accordingly, we conclude that Ruhl was a prevailing party on its breach of contract claim and is entitled to attorney fees and costs in accordance with the terms of the Listing Agreement.

¶ 107          As a result, remand is necessary for Ruhl to prove up the amount it claims it is owed and for the trial court to determine the reasonableness of the fees and the appropriate amount of recovery. Because the parties have never litigated the issue of attorney fees and costs below, we express no view on the permissible fees or costs provided for in the Listing Agreement, the appropriateness of which is to be determined by the trial court in the exercise of its sound

discretion.

¶ 108 Additionally, because of the way the trial court addressed the claims below, we conclude that we need not make an ultimate determination regarding Ruhl's claim under the Act. The court determined that the claims for lien and breach of contract rose and fell together and used section 10(c) of the Act to construe the Listing Agreement as requiring commission payments to be made in installments. For the reasons stated earlier, we reverse the trial court's decision regarding the construction of the Listing Agreement and applicability of section 10(c).

¶ 109 However, the trial court also recognized that RJR Holdings, pursuant to the November 2019 order, paid the earned commission of $46,051.83 in full, albeit belatedly and in installments.

¶ 110 We recognize that the fee shifting provision under the listing agreement is not identical to the prevailing party provision in section 10(*l*) of the Act. See 770 ILCS 15/10(*l*) (West 2014) ("The cost of proceedings asserting or defending a broker's claim of lien, including reasonable attorneys' fees, costs, and prejudgment interests due to the prevailing party shall be borne by the nonprevailing party or parties. When more than one party is responsible for costs, fees, and prejudgment interests, the costs, fees, and prejudgment interests shall be equitably apportioned by the court among those responsible parties."). Given this context, we conclude the most appropriate result is to leave open the possibility for the trial court to determine on remand (1) the appropriate award of fees and costs to Ruhl under the terms of the Listing Agreement up to and including this appeal and (2) whether and to what extent Ruhl is entitled to fees and costs under the Act in the event that any such amount would be greater than the award under the Listing Agreement.

¶ 111 Given the extreme age of this case and the uncertainty of whether the amount of

recovery would, in fact, be different under the Act, we make clear that the trial court is not required to make this determination if not sought by the parties on remand.

¶ 112                                III. CONCLUSION

¶ 113          For the reasons stated, we reverse the trial court's judgment and remand for further proceedings consistent with this decision.

¶ 114          Reversed and remanded.